PETER F.A. BROWN,

    Plaintiff,

v.                    406CV002

MICHAEL CHERTOFF, Secretary, Department of Homeland Security; and DEPARTMENT OF HOMELAND SECURITY,

    Defendants.

## ORDER

## I. INTRODUCTION

Plaintiff Peter Brown brought this action against Michael Chertoff and the Department of Homeland Security (collectively the "Government") alleging that various forms of discrimination motivated his termination from the U.S. Customs and Border Protection Savannah Laboratory. Doc. # 1. Due to prior motion work, only Count II, alleging retaliation for protected activity under Title VII, remains. Doc. # 1 at 12-14 (Brown's retaliation claim); doc. ## 57, 89 (dismissing some claims and granting summary judgment on others).

The Government moved for summary judgment on Brown's remaining claim (doc. # 58), prompting Brown to move under F.R.Civ.P. 56(f)[1] to take certain depositions to oppose the summary judgment motion (doc. # 83). The Court granted that request and denied the Government's motion without prejudice. Doc. # 91.

Those depositions have since been taken and the Government renews its motion for summary judgment. Doc. # 107. But Brown now moves to compel discovery (doc. # 112), for spoliation-of-evidence sanctions (doc. # 113), and for leave to withhold his response to the Government's summary judgment motion until after the Court has ruled on his discovery motions (doc. # 114).

The Magistrate Judge ruled on the motion to compel (doc. # 129), and the Government does not oppose (doc. # 115) Brown's leave request, so it is granted. Thus the only motion deserving discussion is Brown's motion for sanctions.

## II. BACKGROUND

Brown was employed for approximately 20 years at the U.S. Customs and Border Protection Savannah Laboratory (the Lab), a unit of the Department of Homeland Security (DHS). Doc. # 1 at 2-3. He specialized in organic chemistry. *Id.* at 3. At some point in 2000, the Lab transferred him from the "Organic Team" to the "Inorganic Team," though he continued to analyze only organic material. *Id.* at 3-4.

In the summer of 2002, the Lab began assigning "inorganic material" (metal, rock) tasks to Brown. *Id.* Brown felt he was unqualified, but the Lab disagreed. Doc. # 8 at 8. When the Lab director noted that Brown must have learned something about inorganic

---

[1] Rule 56(f) states:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) deny the motion;
>
> (2) order a continuance to enable ... depositions to be taken ... ; or
>
> (3) issue any other just order.

Rule 56(f).

chemistry during his two years on the Inorganic Team, Brown sent his supervisor an email asking "Has [the lab director] been in a coma? Has the Assistant Laboratory Director led him down a garden path?" Doc. # 26, exh. A at 4.

Also in response to his reassignment, Brown complained over his Lab superiors' heads to DHS superiors, and also to the American Association of Laboratory Accreditation (A2LA) -- claiming the Lab was violating accreditation standards by having an organic chemist analyze inorganic material. Doc. # 1 at 5-6. In an effort to be put back on the Organic Team, Brown invoked DHS's Equal Employment Opportunity (EEO) procedures, where he claimed discrimination pursuant to the ADEA and Title VII.[2] Id. at 6.

Finally, on at least one occasion in late 2002 Brown added a caveat to a lab report for an analysis of inorganic material. In it he stated that he did not feel competent to perform the analysis but did it anyway at management's request. Doc. # 1 at 6. In response to this caveat, the Lab provided Brown 10.6 hours of training in inorganic analysis. Id.

The Lab Director also responded. On 11/21/02, he sent Brown a memo instructing him not to write such caveats on his lab reports, nor otherwise inform lab report recipients ("customers") that he felt unqualified. Id. at 7. In reply, Brown resorted to writing "see memo" (or similar wording) on his lab reports of inorganic analyses, thus attempting to beckon the reader to read the 11/21/02, "stop-with-the-caveats" memo. Id. at 7-8.

In 3/03, Lab management asked Brown what the "see memo" comments in his lab reports meant. Id. at 8. On 4/11/03, after learning the meaning of Brown's comments, management recommended that DHS Human Resources take serious disciplinary action for Brown's "seditious" behavior. Id. at 9 (quoting 4/11/03 memorandum). Subsequently, the DHS terminated him for "(1) insubordination; (2) inappropriate conduct [for the email containing "coma" and "garden path" comments]; and (3) failure to complete work assignments." Id. at 10.

Brown appealed his termination to the U.S. Merit Systems Protection Board (MSPB). Id. He raised various claims including retaliatory termination for his prior Equal Employment Opportunity (EEO) activities in violation of Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. § 2000e, et seq. Id. The Administrative Judge (AJ) found that the DHS had established insubordination and inappropriate conduct, and rejected all of Brown's claims. Id. at 10-11. Brown unsuccessfully petitioned the MSPB for reconsideration, so the AJ's decision became the final decision of the MSPB. See Bante v. Merit Sys. Prot. Bd., 966 F.2d 647, 648 (Fed. Cir. 1992) (AJ's decision becomes final decision of MSPB when MSPB denies review).

Brown's current spoliation claim arises from document destruction that traces back to the bureaucratic layers of review contained within the aforementioned process. When management complains of employee misconduct, the U.S. Customs and Border Protection ("the agency") follows a multi-layered disciplinary procedure. First, management's allegations of misconduct are given to an employee relations (ER) specialist who performs an initial investigation. Doc. # 119-7 at 5 (as numbered by CM/ECF) (Coleman depo.). The ER specialist processes

---

[2] Brown claimed he was discriminated against as a white, Catholic male over age 40. Doc. # 119-7 at 14.

the case. *Id.* More serious allegations of misconduct warrant eventual submission to the Discipline Review Board (DRB) which then proposes a punishment. *Id.* Before going to the DRB, the ER specialist discusses the matter with Internal Affairs (IA). *Id.* IA either investigates the matter or appoints a fact-finder. *Id.* But, in rare situations, if the ER specialist already has sufficient documentation of the misconduct, IA, after consultation, will not involve itself and instead the case is taken straight to the DRB. *Id.*

The ER specialist, after gathering all of the information into a case file, submits it to the DRB for review. *Id.* at 8. Two weeks later, the ER specialist meets with the DRB, provides a summary of the case, and fields questions on the worker's employment history (discipline, awards, term of service, etc.). *Id.* at 9. The DRB proposes a penalty which prompts the ER specialist to draft a "proposal letter." *Id.* The employee then has an opportunity for an oral reply from which a transcript is produced. *Id.* at 17-18. The transcript of the oral reply is submitted with the case file to the Deciding Official (DO) who actually makes the final punishment decision for the agency.

Prior to any decision, the DO and the ER specialist meet to review the submitted materials and discuss the *Douglas* factors -- 12 criteria developed in *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313 (M.S.P.B. 1981), to help agencies assess a reasonable penalty against an employee. Doc. # 119-7 at 18. The DO then makes a decision and the ER specialist drafts a "decision letter" reflecting that determination. *Id.*

Tracy Coleman was the ER specialist assigned to Brown's case. *Id.* at 8. Thus, Coleman performed most of the legwork in the discipline process. According to her deposition, she took notes during various stages of the proceedings including: (1) notes to provide a summary of the case to the DRB ("summary notes"); (2) notes of the DRB proceeding ("DRB notes"); (3) notes of Brown's employment history; (4) notes of the oral reply; and (5) notes of the discussion with the DO ("DO notes"). *Id.* at 9, 10, 17, 18.

While these notes were part of Brown's case file, they were never produced to Brown (even though the rest of the case file was given to him during the disciplinary process). Brown's case file, including the notes, was later destroyed during an agency building-relocation -- when *all* closed disciplinary case files (around 200) from 2003 (the year of Brown's disciplinary action) were destroyed. Doc. # 119 at 2. Brown's case file was destroyed in 8/06, seven months after he filed this case (1/4/06). *Id.* at 3-4. Brown first learned of its destruction at Coleman's deposition.

Brown now argues that the destruction of these notes merits sanctions against the Government for the failure to preserve relevant evidence. Doc. # 113. He calls for (1) an adverse inference that the notes contained evidence favorable to his case; (2) denial of the Government's summary judgment motion; and (3) a jury instruction that the notes' destruction constitutes evidence of pretext. *Id.* at 1. The Government, meanwhile, admits to the negligent destruction of the materials but minimizes their significance in arguing that sanctions are not warranted. Doc. # 119.

III. <u>ANALYSIS</u>

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Griffin v. GMAC Commercial Finance, L.L.C.*, 2007 WL 521907 at * 3 (N.D.Ga. 2/15/07)

3

(unpublished) (quotes omitted). District courts have broad discretion to impose sanctions against spoliators.

In exercising that discretion, district courts must consider: (1) whether the plaintiff was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the defendant acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.[3] *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005). Potential sanctions include: (1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator. *Id.*

Again, Brown's underlying claim is for illegal retaliatory termination based on his prior EEO activity. To establish a *prima facie* case of retaliation under Title VII (and thus a presumption of retaliation), a plaintiff must show: (1) he participated in an activity protected by Title VII; (2) he suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action. *Brown v. City of Opelika*, 211 Fed.Appx. 862, 863 (11th Cir. 2006).

Upon establishment of a *prima facie* case, the burden shifts to the employer to produce legitimate reasons for the adverse employment action. *Id.* at 864. Those legitimate reasons rebut the previously established presumption of retaliation. *Id.* The plaintiff then must show that the proffered reasons are merely pretext for the employer's retaliatory action. *Id.* If pretext is established, the defendant may still assert a "mixed motive" defense -- that the defendant would have made the same decision without an illegal motive. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1268-69 (11th Cir. 2001).

Brown claims that the destruction of his case file prejudices him in his ability to establish pretext. Doc. # 113 at 13. To adequately show pretext, Brown must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotes and cite omitted). In other words, he must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (quotes omitted).

Brown's position has merit. Coleman's notes, Brown insists, would have shed light on the decision-making process that led to his termination. *Id.* at 14. More specifically, those notes covered the information she presented to the DRB, the DRB proceedings, and her discussions with the DO -- all of which might be useful to undermine the agency's proffered legitimate reasons for termination (insubordination and inappropriate conduct).

The notes might also have documented why IA did not perform an investigation into the allegations of Brown's misconduct. *Id.* According to agency procedure, an IA investigation is routinely conducted during the disciplinary process. Doc. # 119-7 at 5. Because no investigation occurred, the DRB did

---

[3] Neither party makes any argument regarding the fifth factor and it does not seem applicable in this case. Thus it will not be considered.

4

not review a Report of Investigation from the IA (something the DRB normally does). *Id.* And under employment discrimination law, an employer's failure to follow its own policies may be evidence of pretext. *Connor v. Sun Trust Bank*, ___ F.Supp.2d ___, 2008 WL 623027 at * 11 (N.D.Ga. 3/5/08). To "establish pretext based on a failure to follow procedures," it must be remembered, "a plaintiff must show that the deviation from policy occurred in a discriminatory manner." *Keaton v. Cobb County*, ___ F.Supp.2d ___, 2007 WL 4941022 at * 25 (N.D.Ga. 2/19/08). Here the agency chose not to perform an IA investigation in Brown's case, but there is no documentation of that decision, which means that these destroyed notes may have been informative.

All of this must be viewed against the larger backdrop -- employment discrimination cases hinge on a plaintiff's ability to show improper considerations motivated an adverse employment action (*i.e.*, termination). So a record documenting those considerations is quite relevant; the destruction of that very record, then, naturally causes prejudice. Here Coleman's notes represent an informal contemporaneous record of the decision-making process to terminate Brown. Such a record is highly relevant to proving the Government's proffered legitimate reasons are nothing more than pretext.

Given the relevance of Coleman's notes, some prejudice must follow from their destruction. "If relevant evidence is not produced, for whatever reason, and then is destroyed before either party learns of the existence of that evidence, then the absence of the relevant evidence prejudices the party that would have relied on it to prove its case." *Connor*, 2008 WL 623027 at * 12. While the Government insists it is pure speculation that the notes contained any damaging evidence (*e.g.*, EEO references), that is not the appropriate inquiry. To require a party to show, before obtaining sanctions, that *unproduced* evidence contains damaging information would simply turn "spoliation law" on its head. *See Residential Funding Corp. v. Degeorge Financial Corp.*, 306 F.3d 99, 109 (2d Cir. 2002) ("Courts must take care not to hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence, because doing so would subvert the ... purposes of the adverse inference, and would allow parties who have ... destroyed evidence to profit from that destruction") (quotes omitted). Therefore, courts properly focus on the relevance of the destroyed evidence in determining prejudice. *Flury*, 427 F.3d at 945 (destroyed evidence was "central" to defendant's case). Brown therefore has shown the first factor.

Moving to the second factor, the Government insists that any potential prejudice has been cured by Coleman's testimony regarding her notes, along with the testimony of a DRB member and the DO regarding the decision-making process. Those individuals have all testified that no consideration at all was given to Brown's EEO complaint. Doc. # 119 at 15, 17. In fact, Coleman deposed that she never presented any information to the DRB or the DO regarding Brown's EEO complaint, nor would there have been any mention of it in her notes. Doc. # 119-7 at 14, 22, 24. For that matter, the only mention of his EEO activity during the process was by Brown himself at the rebuttal stage. Doc. # 119 at 15. According to the Government, the availability of their testimonies cures any prejudice from the destruction, and the substance of their statements show a lack of prejudice at all.

Brown disagrees, claiming that three/four-

5

year-later-testimony is no substitute for notes recorded contemporaneously with the disciplinary process. Doc. # 127 at 17. He points to Coleman's admission that she attempted to review the destroyed case file prior to her deposition to refresh her memory. *Id.* Furthermore, in that deposition she does not recall the details of her notes or the rest of the file. *Id.*

The Court agrees, and the Government admits (doc. # 119 at 14), that the notes are more reliable than the deponents' memories (time, of course, erodes all human memory). Yet, their sworn testimony is that Brown's EEO activity was not considered. In essence, Brown now questions their credibility and memory capability (and the notes would aid him in doing so), but those are issues that can be tested and determined by a jury at trial. Of course, the absence of these notes makes Brown's case more difficult to prove. On balance, then, the available testimony of the individuals involved in the discipline process alleviates only some, but not all, of the prejudice stemming from the spoliation.

As for the third factor -- the significance of the missing evidence -- the Government minimizes the practical importance of these notes through Coleman's testimony that her summary notes only reflected the information of other materials in the case file (that part of the case file was produced to Brown). Doc. # 119-7 at 9. And the contents of her DRB notes and DO notes were contained in the "proposal letter" and "decision letter," respectively. *Id.* at 9, 19. Thus, the Government concludes, the actual notes are of little importance because they are contained in other materials that *were* provided to Brown. Brown does not respond to this assertion, so it must weigh in favor of no sanctions.

Also claiming the lack of an IA investigation was insignificant (thus any notes regarding the decision lack importance), the Government illuminates Coleman's testimony explaining why an IA investigation did not occur:

> In this particular case, all the facts -- in this case there was no need for an investigator or a fact-finder because we had all of the documentation, statements from management. [¶] And in cases like that, which are very rare, we can proceed with sufficient documentation to the DRB. And in this particular case, that's what we did.

*Id.* at 5.

The Government also highlights an internal office memorandum (the "Winwood Memo") that declared that employee insubordination need not be investigated by IA. Doc. # 119-9 at 3. This is further supported by an IA employee's sworn declaration that "it was not the practice of USCS/IA to investigate allegations of employee insubordination." Doc. # 119-8 at 1 (Pignone declaration). Thus, says the Government, an IA investigation normally would *not* occur in this situation. So, the Government concludes, any notes regarding the decision not to conduct an investigation are of little value here.

But there is some discrepancy between the Winwood Memo/Pignone Declaration and Coleman's deposition. Coleman stated that "[t]he normal procedure for cases that go before the [DRB] is that they are reported to [IA]," and IA investigates in some manner. Doc. # 119-7 at 5. What occurred here, according to her, was "rare." *Id.* at 6. This dispute increases the potential importance of any evidence that might

explain the decision for IA not to investigate.[4]

So far the Court has determined that the relevant nature of the destroyed notes prejudices Brown. But the testimony of Coleman and the other participants in the disciplinary process cures that prejudice to some extent, though not completely given the value of a contemporaneous record versus testimony three or four years after the fact. The Government also says that the contents of those notes are reflected in other materials, thereby minimizing their importance, so no sanctions should be imposed. Yet, the parties disagree over the importance of any potential notes documenting the lack of an IA investigation. Considering all of the evidence together under the first three factors, the Court concludes that Brown is suffering some prejudice from the document destruction in question.

As for the fourth factor, the Government concedes that it prematurely destroyed Brown's case file in violation of an EEOC regulation and a General Records Schedule (the agency's rules regarding destruction of case files). Doc. # 119 at 2. But because it was destroyed (along with 200 other closed case files from that same year) as a cost-saving measure during an office move, the Government argues such conduct was merely negligent and not worthy of sanctions. *Id.* In other words, there was no bad faith and thus there is no support for an adverse inference. *See Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) ("Mere negligence in losing or destroying the records is not enough for an adverse inference, as it does not sustain an inference of consciousness of a weak case"); *Penalty Kick Management Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1294 (11th Cir. 2003) ("[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith").

But since *Flury*, bad faith is only one factor to consider. 427 F.3d at 946. Now courts "should weigh the degree of the spoliator's culpability against the prejudice to the opposing party." *Id.* In evaluating culpability, district courts routinely look to a party's failure to take proper measures to preserve evidence. *Ladner v. Litespeed Mfg. Co.*, 537 F.Supp.2d 1206, 1214 (N.D.Ala. 2008) (court examined whether or not there was a "failure to exercise any precautions to safeguard" evidence); *National Grange Mut. Ins. Co. v. Hearth & Home, Inc.*, 2006 WL 5157694 at * 5 (N.D.Ga. 12/19/06) (unpublished) (where "plaintiff had access to and control over the evidence and failed to preserve it," culpability rested with plaintiff).

Here, the Government is clearly culpable for the destruction of this evidence. Brown's adverse case file was not destroyed until seven months after the current case was filed. Doc. # 119 at 3-4. Even before the current litigation the Government was on notice that it should have preserved relevant evidence such as Brown's adverse case file. Brown had already appealed his termination to the MSPB earlier -- putting the Government on notice that litigation would likely follow. On top of all that, the Government violated its own General Records Schedule and an EEOC regulation by destroying Brown's case file prematurely.

---

[4] In an earlier Order, the Court reviewed the MSPB's determination that the lack of an IA investigation was not an error in the agency's discipline procedures. Doc. # 57 at 15-16. By statute (5 U.S.C. § 7703(c)), the Court had to apply an arbitrary and capricious standard in reviewing the MSPB's decision (which the Court found was proper under that standard). But that previous decision is not controlling (and has no bearing) here because the Court must conduct a *de novo* review of Brown's Title VII discrimination claim. *See Kelliher v. Veneman*, 313 F.3d 1270, 1274-75 (11th Cir. 2002).

So the fact that this file was negligently destroyed in a mass purging of case files does not excuse the Government's culpability for its destruction. The level of prejudice to Brown from the spoliation, coupled with the Government's fault merits some form of sanction. However, considering the absence of bad faith and the opportunities to alleviate some of that prejudice through testimony, a severe sanction is not warranted here.

Should this case survive renewed summary judgment, then, the Court will instruct the jury that the Government's destruction of Coleman's notes raises a rebuttable inference that they contained evidence of pretext. But the Court will also instruct that the Government is free to rebut that adverse inference by showing that those materials contained no such evidence.

In that vein, the Court will accept that Brown has established pretext in opposition to the Government's motion for summary judgment. Accordingly, the Court denies the Government's summary judgment motion without prejudice to its right to renew it should it wish to demonstrate that, notwithstanding Brown's pretext showing, it is still entitled to summary judgment against him.[5] Any renewal motion must be filed within 15 days of the date this Order is served.

## IV. CONCLUSION

The Court *GRANTS* in part and *DENIES* in part plaintiff Peter Brown's motion for sanctions. Doc. # 113. The Government's motion for summary judgment is *DENIED WITHOUT PREJUDICE* to its right to renew it within the conditions set forth *supra*. Doc. # 107. Brown's unopposed motion (doc. # 114) for leave to withhold his response to the Government's summary judgment motion until after the Court has ruled on his discovery motions (motion to compel and the instant spoliation motion) is also *GRANTED*. Brown shall have 30 days from the date he is served with any renewed summary judgment motion by the Government.

This __18__ day of June, 2008.

*/s/ B. Avant Edenfield*
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[5] Of course, the Court expresses no opinion whether Brown can even establish a *prima facie* case of Title VII retaliation.