UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

PETER F.A. BROWN,

    Plaintiff,

v.                       406CV002

MICHAEL CHERTOFF, Secretary, Department of Homeland Security; and DEPARTMENT OF HOMELAND SECURITY,

    Defendants.

## ORDER

### I. INTRODUCTION

Plaintiff Peter Brown brought this action against Michael Chertoff and the Department of Homeland Security (collectively the "Government") alleging that various forms of discrimination motivated his termination from the U.S. Customs and Border Protection's Savannah Laboratory. Doc. # 1. Due to prior motion work, only Count II, alleging retaliation for protected activity under Title VII, remains. Doc. # 1 at 12-14 (Brown's retaliation claim); doc. ## 57, 89 (dismissing some claims and granting summary judgment on others). The Government has moved for summary judgment on that claim. Doc. # 138. In connection with this Motion, Brown has also moved to strike the testimony of two individuals who were not disclosed as potential witnesses in the Government's initial disclosures. Doc. # 144, 153.

### II. BACKGROUND

Brown was employed for approximately 20 years at the U.S. Customs and Border Protection (the Agency)'s Savannah Laboratory (the Lab), a unit of the Department of Homeland Security (DHS). Doc. # 1 at 2-3. He specialized in organic chemistry. *Id.* at 3.

At some point in 2000, the Lab transferred him from the "Organic Team" to the "Inorganic Team," though he continued to analyze only organic material. *Id.* at 3-4.

In the summer of 2002, the Lab began assigning "inorganic material" (metal, rock) tasks to Brown. *Id.* Brown felt he was unqualified, but the Lab disagreed. Doc. # 8 at 8. When Lab Director Cecil Clements noted that Brown must have learned something about inorganic chemistry during his two years on the Inorganic Team, Brown sent his supervisor, Assistant Lab Director Carson Watts, an email asking "Has [the lab director] been in a coma? Has the Assistant Laboratory Director led him down a garden path?" Doc. # 26, exh. A at 4.

Also in response to his reassignment, Brown complained over his Lab superiors' heads to DHS superiors, and also to the American Association of Laboratory Accreditation (A2LA) -- claiming the Lab was violating accreditation standards by having an organic chemist analyze inorganic material. Doc. # 1 at 5-6. In an effort to be put back on the Organic Team, Brown invoked DHS's Equal Employment Opportunity (EEO) procedures, where he claimed discrimination pursuant to the ADEA and Title VII.[1] *Id.* at 6. On 10/7/02 an EEO manager called Lab Director Clements and informed him that Brown had filed a request for EEO counseling. Doc. # 143-2 at 87.

After learning of Brown's EEO counseling Clements called Ira Reese, Director of Customs' Laboratory Services at Agency Headquarters in Washington, D.C., shared with him the information that Brown had initiated EEO counseling, and asked to

---

[1] Brown claimed he was discriminated against as a white, Catholic male over age 40. Doc. # 119-7 at 14.

transfer Brown to agency headquarters in D.C. Doc. # 143-6 at 13. Reese refused the transfer on the grounds that transfers are not permitted for "disciplinary reasons," *id.*, and told Clements that "if [Clements was] having trouble getting Brown to work stone samples [he] should document dereliction of duty or insubordination and put him on a [performance improvement plan] if he could not do the work." *Id.*

In late 2002 Brown added a caveat to a lab report for an analysis of inorganic material. In it he stated that he did not feel competent to perform the analysis but did it anyway at management's request. Doc. # 1 at 6. In response to this caveat and Brown's training concerns, the Lab provided Brown 10.6 hours of training in inorganic analysis. *Id.*

Lab Director Clements also responded. On 11/21/02, he sent Brown a memo instructing him not to write such caveats on his lab reports or otherwise inform lab report recipients ("customers") that he felt unqualified. *Id.* at 7. Brown then resorted to writing "see memo" (or similar wording) on his lab reports of inorganic analyses, thus attempting to beckon the reader to read the 11/21/02, "stop-with-the-caveats" memo. *Id.* at 7-8.

During this time, Brown had been proceeding through the EEO's counseling process. On 1/15/03 he filed a formal EEO complaint. Doc. # 143-2 at 26. The Agency accepted the complaint for investigation on 2/24/03. Doc. # 1 at 6.

In March 2003, Lab management asked Brown what the "see memo" comments in his lab reports meant. *Id.* at 8. On 4/11/03, after learning the meaning of Brown's comments, Lab Director Clements prepared a memo accusing Brown of "seditious activities" and recommending that "the strongest action possible be taken" against Brown, although he did not recommend any specific punishment. Doc. # 29-2 at 58-60. He sent the memo to Tracy Coleman, one of the Agency's employment relations (ER) specialists in Washington, D.C. *Id.*

The Agency has a multi-layered disciplinary procedure. Management's allegations of misconduct are given to an ER specialist who performs an initial investigation and processes the case. Doc. # 119-7 at 5. More serious allegations of misconduct warrant eventual submission to the Discipline Review Board (DRB) which then proposes a punishment. *Id.* Before going to the DRB, the ER specialist discusses the matter with Internal Affairs (IA). *Id.* IA either investigates the matter or appoints a fact-finder. *Id.* But, in rare situations, if the ER specialist already has sufficient documentation of the misconduct, IA, after consultation, will not involve itself and instead the case is taken straight to the DRB. *Id.* Tracy Coleman and Rebecca Canoyer were the ER specialists involved with Brown's case. Doc. # 143 at 3. Coleman testified that Brown's case was one of those "rare" situations in which an IA investigation was not required. Doc. # 119-7 at 5. Thus, no IA fact-finding investigation was conducted in Brown's case, and the parties dispute whether Agency policy required one. Doc. # 143 at 7.

Coleman presented the Agency's case for disciplinary action to the three person Discipline Review Board made up of Glenn Nick, Franklin Jones, and Cathy Sauceda. *Id.* at 7-8. After reviewing information presented to them by Coleman, which included materials provided by Clements, the DRB proposed that Brown be terminated. *Id.* at 8.

The DRB sent Brown a notice of its proposal to terminate him, its reasoning behind the decision, and a copy of the information that it relied on in reaching its decision. Doc. # 26-5 at 1-5. Additionally, it notified him of his right to reply to the proposal orally or in writing, to furnish affidavits and other documentary evidence, and to be represented by an attorney or other representative. *Id.*

The DRB recommendation was then transmitted to Acting Assistant Commissioner Charles Armstrong -- the deciding official in Brown's case. Doc # 143 at 8. Brown presented his case to Armstrong orally with representation from a union official. Doc. # 137-4 at 47-51. In reaching his decision, Armstrong testified that he considered the same investigative materials as the DRB as well as Brown's oral reply. Doc. # 139 at 8-9. Those materials included Clements' 4/11/03 letter and other information supplied by Clements and Coleman (who were both aware of Brown's EEO activity). Doc. # 143-2 at 29. Armstrong testified that it is his practice to use the "*Douglas* factors" -- 12 criteria developed in *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313 (M.S.P.B. 1981) -- to determine the appropriate disciplinary penalties against an employee. Doc. # 26-5 at 13. However, he failed to document his *Douglas* factor analysis. Doc. # 143 at 9. Armstrong decided that Brown should be terminated for "(1) insubordination; (2) inappropriate conduct [for the email containing "coma" and "garden path" comments]; and (3) failure to complete work assignments." Doc. # 1 at 10.

Brown appealed his termination to the U.S. Merit Systems Protection Board (MSPB). *Id.* He raised various claims including retaliatory termination for his prior Equal Employment Opportunity (EEO) activities in violation of Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. § 2000e, et seq. *Id.* The Administrative Judge (AJ) found that the DHS had established insubordination and inappropriate conduct, and rejected all of Brown's claims. *Id.* at 10-11. Brown unsuccessfully petitioned the MSPB for reconsideration, so the AJ's decision became the final decision of the MSPB. *See Bante v. Merit Sys. Prot. Bd.*, 966 F.2d 647, 648 (Fed. Cir. 1992) (AJ's decision becomes final decision of MSPB when MSPB denies review).

Brown argues that his termination violated Title VII in that it was in retaliation for filing an EEO complaint against the Agency. Doc. # 1 at 12-14. Defendants have moved for summary judgment on that issue. Doc. # 138. As an ancillary matter, Brown has moved to strike evidence contained in the declarations of Frank Cipolla and Christopher Pignone submitted by the Government in support of its Motion. Doc. ## 144, 153. That evidence is relevant to the issue of whether an independent IA investigation of Brown's conduct was required by Agency policy.

### III. ANALYSIS

#### A. Standard of Review

In a § 7703 "mixed case" such as this, the district court tries the discrimination claims *de novo*. *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002). Thus, the AJ's determination that the plaintiff was terminated for legitimate reasons has no preclusive effect. *Chandler v. Roudebush*, 425 U.S. 840 (1976) (holding that a federal employee whose discrimination claim was rejected by her employing agency and reviewed by district court was entitled to a *de novo* review); *Rosenfeld v. Dept. of Army*, 769 F.2d 237, 239

3

(4th Cir. 1985) ("Prior administrative findings, whatever result may be reached, are ordinarily not entitled to preclusive effect in a subsequent discrimination suit, even though the same facts are in dispute.")

Thus, Brown's retaliation claim is treated under normal summary judgment standards. Summary judgment is appropriate where the evidence before the Court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). In determining whether summary judgment is appropriate, the facts and inferences from the record are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Of course, mere speculation cannot sustain opposition to a party's summary judgment motion. *See Howard v. Oregon Television, Inc.*, 2008 WL 1947094, at * 1 (11th Cir. 5/6/08) (unpublished) ("Speculation does not create a genuine issue of fact") (quotes and cite omitted); *Huggins v. Teamsters Local 312*, 585 F.Supp. 148, 150-51 (E.D.Pa. 1984) ("[M]ere inferences, conjecture, speculation or suspicion are insufficient to establish a material fact upon which to base the denial of summary judgment.")

## B. Motion to Strike

Before reaching the merits on Brown's claim, the Court turns to Brown's Motion to Strike the declarations of Frank Cipolla and Christopher Pignone that the Government has submitted in support of its Motion for Summary Judgement. Doc. # 144, 153. Brown alleges violations of F.R.Civ.P. 26(a)(1)&(e), arguing that Cipolla and Pignone were not identified in the Government's 26(a)(1) initial disclosures or through a 26(e)(1) supplemental disclosure. Thus, any statements from them should be excluded under F.R.Civ.P. 37(c)(1). In response, the Government points to certain interrogatories in which Cipolla and Pignone were identified and the subject of their knowledge was made known. Doc. ## 146, 154.

Rule 26(a) requires parties to provide an initial disclosure containing the identity of each individual likely to have discoverable information along with the subjects of that information. F.R.Civ.P. 26(a)(1). Rule 26(e) requires parties to supplement their 26(a) disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." F.R.Civ.P. 26(e)(1)(A). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." F.R.Civ.P. 37(c)(1).

The Government did not include Cipolla or Pignone in its Rule 26(a)(1) initial disclosure. Doc. ## 84-2 at 50, 84-3 at 1-2. Nevertheless, it asserts that supplementation of the initial disclosure was not required under Rule 26(e). Under that rule

> a party is under no duty to formally supplement its initial disclosures with

information that has otherwise been made known to the opposing party in discovery. The Advisory Committee Notes to Rule 26(e) provide that there is "no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition...." Similarly, Professors Wright and Miller explain that this provision "recognize[s] that there is no need as a matter of form to submit a supplemental disclosure to include information already revealed by a witness in a deposition or otherwise through formal discovery." 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2049.1.

*Hooker v. Fulton County*, 2006 WL 2617142, * 4 (N.D.Ga. 9/12/06) (unpublished) (quotes and cite omitted).

Here, the Government argues that Cipolla and Pignone were revealed during discovery as individuals likely to have discoverable information. After the initial discovery period in this case had closed, the Court provided for a follow-up discovery period. Doc. # 96. During that time, Brown submitted interrogatories related to the Agency's disciplinary procedures. *See* doc. #146-2 at 5-6. To paraphrase, the questions asked whether the Agency followed its disciplinary policy when terminating Brown, whether the Agency has reviewed how that policy has been implemented in the past, and inquired into the relationship between the discipline processes of two different Customs agencies. *Id.* The Government objected to the questions, provided a brief response (i.e.,

"Defendant states that the Agency properly followed all of the procedures that are briefly summarized in the Guide to Good Conduct and the Discipline Process"), and then indicated that "Frank Cipolla, Branch Chief, Employee Relations, Office of Human Resource Management, and Christopher Pignone, Office of Internal Affairs, provided the information necessary to answer this interrogatory." *Id.* at 5.

Brown argues that this disclosure was insufficient to satisfy the 26(e)'s duty to supplement. Doc.# 153 at 3. The Court disagrees. Brown has made the Agency's adherence to its disciplinary policy an issue in this case. Doc. # 1 at 41-43. It is clear from the responses to the interrogatories that the Government was asserting that it had followed its internal disciplinary policy and that Cipolla and Pignone had the information necessary to prove that. Brown was aware of the identities of Cipolla and Pignone during discovery and could have sought to depose them had he chose to do so. *See Blake v. City of New York*, 2007 WL 1975570, *5 (S.D.N.Y. 7/6/07) (unpublished) (motion to strike affidavit was denied because plaintiffs had been on notice that affiant was a potential witness, they learned this fact when discovery was still open, and they could have deposed him).

Brown says that he was surprised by the contents of the declarations of Cipolla and Pignone that were made after the discovery period had ended. Doc. # 153 at 3 ("The extremely limited and somewhat cryptic information stated in response to those three interrogatories demonstrates that Defendants did not timely disclose any of the information contained in the 7-pages of declarations of Mr. Cipolla and Mr. Pignone submitted by Defendants months later and well after the completion of all discovery.") Nothing in the

5

text of Rules 26(a)(1) or 26(e) requires a party to disclose all the information that a witness may possess. Rather, 26(a)(1) only requires disclosure of the "subjects of" information known to a potential witness. This is in contrast to Rule 26(a)(2) which requires disclosure of any witness who may be used as an expert along with "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed.R.Civ.P. 26(a)(2). Indeed, the case cited to by Brown for the notion that "information" - and not just witnesses - must be disclosed to the opposing party dealt specifically with disclosure of expert testimony under Rule 26(a)(2). Doc. # 154 at 2 (citing *Dillman v. Baptist Health Sys.*, 2007 U.S. Dist. LEXIS 95846 (N.D.Ala. 3/27/07) (unpublished) (excluding expert's evidence for failing to disclose under Rule 26(a)(2))).

The Government did not fail to comply with Rule 26(e)(1), so no sanctions under Rule 37(c)(1) are warranted. Brown was on notice that these individuals had information that would be relevant to the Government's defense long ago. The Court denies Brown's Motion to Strike.

Brown also objects to the admissibility of Cipolla and Pignone's declarations under Federal Rules of Evidence 601-602 and 701-703. Doc. # 153 at 8. By virtue of their positions, these two individuals would have personal knowledge regarding the Agency's policies on conducting disciplinary investigations. *See Stuart v. UNUM Life Ins. Co. of America*, 217 F.3d 1145, 1154-1155 (9th Cir. 2000) (position within organization can provide the personal knowledge required by F.R.E. 602 to testify about operational procedures). To the extent that the opinions relate to the Agency's policies and are not expert opinions that do not rely on specialized technical knowledge, *see* F.R.E. 702, the court overrules Brown's objections.

## C. Title VII Retaliation Claim

The Court turns to Brown's retaliation claim. For Brown to establish a prima facie case of retaliation under Title VII, he must present evidence that: "(1) he engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision." *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006). Where, as here, a plaintiff alleges retaliation based on circumstantial evidence, the Court applies the *McDonnell Douglas* framework. *Gray v. Vestavia Hills Bd. of Educ.*, 2008 WL 5064890, * 3 (11th Cir. 12/2/08) (unpublished) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under that analysis, "[i]f the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action.... If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Hurlburt v. St. Mary's Health Care Sys.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (citations omitted).

Even if a plaintiff shows that a defendant's proffered reasons for the employment action were pretextual, "an employer can avoid liability if it can prove that it would have made the same disputed employment decision in the absence of the alleged bias." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001). That is, an employer can prevail when it can show that "both legitimate and illegitimate reasons motivated the decision." *Desert Palace v.*

6

*Costa*, 539 U.S. 90, 93 (2003). Although the Civil Rights Act of 1991 eliminated this "mixed motive" defense as a complete defense in certain discrimination actions, it is still available as a complete defense in retaliation cases. *Pennington*, 261 F.3d at 1269.

Complicating its analysis is this Court's prior Order granting a spoliation of evidence sanction based on the negligent destruction of notes taken by Tracy Coleman related to Brown's case. Doc. # 134. The Court considered the prejudice to Brown as well as mitigating factors and concluded that "considering the absence of bad faith and the opportunities to alleviate some of that prejudice through testimony, a severe sanction is not warranted here." *Id.* at 8. The Court held that it would

> accept that Brown has established pretext in opposition to the Government's motion for summary judgment. Accordingly, the Court denies the Government's summary judgment motion without prejudice to its right to renew it should it wish to demonstrate that, notwithstanding Brown's pretext showing, it is still entitled to summary judgment against him.

*Id.* The Court expressly reserved judgment on whether Brown could establish a prima facie case of retaliation. *Id.* at 8 n. 5. It did not relieve Brown of the burden of producing evidence necessary to establish such. The Government now argues that Brown has failed to do so.

### *1. Establishing a Causal Connection*

Of the three elements of a prima facie retaliation claim, most of the dispute in this case centers on causation. "To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected activity, and that the protected activity and the adverse action were not wholly unrelated." *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001). The causal link element is construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993). Causation can be established by the "close temporal proximity" between the employer's knowledge of the protected activity and the adverse action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir.2004). However, "mere temporal proximity between knowledge of protected activity and an adverse action must be very close" to meet the requirement. *Id.* (quotation and alterations omitted). Without more, a time gap of three months or more does not establish a causal connection. *Id.* at 1221.

Brown asserts that the adverse employment action was proximate in time to his EEO activity, that the individuals involved in his termination had knowledge of his EEO activity, and that the reasons given for his termination were pretextual.[2] Doc. # 143 at

---

[2] Brown's attempt to establish his prima facie case by relying on pretext puts the cart before the horse. Doc. #143 at 26 ("[T]here exist numerous disputes of material fact on issues of pretext that also establish a genuine issue of fact on causation.") Citing to *Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133, 147 (2000), Brown asserts, "the Supreme Court has ruled that a genuine issue of pretext also satisfies the causation element of a prima facie case." Doc. 143 at 19-20. That was not the ruling of that case. The Court concluded, "[A] plaintiff's *prima facie case, combined with* sufficient evidence to find that the employer's asserted

19.

He claims that there is evidence of a retaliatory animus that began brewing shortly after Clements learned of Brown's EEO counseling in 10/02. Clements' 10/7/02 email indicates that he wanted Brown transferred to headquarters, but Reese refused because he considered it to be a disciplinary transfer and instead recommended a performance improvement plan. Doc. # 143 at 23. Also, on 11/15/02 Reese sent an email in which he stated, "Frankly, Mr. Brown has been jerking [Mr. Clements] around for years.... [H]is ability to jerk the system are in top form." *Id.* at 22. And in another email Reese stated, "Mr. Brown has not hesitated to initiate an EEO or [Internal Affairs] complaint for some reason or another." *Id.* Even in a light most favorable to Brown, the Court has difficulty seeing how Reese's refusal to punish Brown for his EEO activity evidences a desire to retaliate against him -- in fact, it suggests the opposite. And Reese's statement that Brown had been "jerking around" Mr. Clements for years indicates that any general animus toward Brown began well before his EEO activity. However, Brown has created a question of causation based on testimony by Reese that talk of terminating Brown was "in the wind" in late 2002, *id.* at 24, and Clements's desire to transfer Brown for "disciplinary" reasons.

Additionally, Brown asserts that retaliation began shortly after he filed his formal EEO complaint on 1/15/03. His primary evidence is the 4/11/03 Clements memo recommending that disciplinary action be taken against Brown for disobeying his orders. *Id.* at 23. Also, in 2/03 Clements requested that an older disciplinary action be resurrected against Brown. *Id.* And, while arguably too remote in time to establish a temporal connection, Brown points to a series of emails in 9/03 -- eight months after his EEO complaint -- in which Brown's name was removed from a list of nominees to receive an award. *Id.* at 21-22.

Viewing these facts in the light most favorable to Brown, the Court will grant that there is a question of fact as to whether Clements or certain other employees[3] attempted to retaliate against Brown for his EEO activity and that Clements recommended disciplinary action against Brown for this reason.

### 2. *Breaking the Causal Connection*

Even so, causation is not established if the decision to terminate Brown was made by an independent decisionmaker who was insulated from the retaliatory animus of others.

---

justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* (emphasis added); *see also id.* ("[pretext] may, *together with the elements of the prima facie case*, suffice to show intentional discrimination") (emphasis added); *id.* ("Certainly there will be instances where, although the plaintiff has established a prima facie case *and* set forth sufficient evidence [of pretext], no rational factfinder could conclude that the action was discriminatory") (emphasis added). Nowhere does *Reeves* say that pretext can be used to establish the causation element of a prima facie case or that pretext comes into the analytical framework prior to proving a prima facie case.

[3] Brown seems to allege a conspiracy to retaliate that included, *inter alia*, Clements, Watts, Reese, Coleman, and Canoyer. *See, e.g.* doc. # 143 at 7 (listing these people as participants in Brown's termination who also had knowledge of his EEO activity.) For reasons that should become clear below, it is not necessary to evaluate the alleged retaliatory animus with respect to each of these individuals since the Court's concern ultimately focuses on the independence of the deciding official.

[A] discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge. *Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291, 294 (11th Cir.1988). However, as we have recently explained, this causation must be truly direct. When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee. *Llampallas*, 163 F.3d at 1248.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999).

Armstrong was the deciding official in Brown's case. The Court's primary focus is whether his decision was sufficiently independent. If so, then the chain of causation is broken, and Brown's prima facie case fails.

Brown attempts to prove a causal connection between Armstrong's decision and the retaliatory animus of others under a "cat's paw" theory. Under that theory, if Brown shows that "[Armstrong] acted in accordance with [management's] decision without [himself] evaluating [Brown's] situation, causation is established." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (internal cite omitted). In such a situation, the person harboring the retaliatory animus "*is* the decisionmaker, and the titular 'decisionmaker' is a mere conduit for [the] animus." *Id.* (emphasis in original). Thus, "where the individual accused of [retaliatory] animus is 'an integral part' of a multi-level personnel decision, their improper motivation may taint[] the entire process." *Roberts v. Randstad North America, Inc.*, 231 Fed.Appx. 890, 895 (11th Cir. 2007) (quotes and cite omitted). However, in order to survive summary judgment, Brown must be able to show not only that his managers held a retaliatory animus against him, but also that Armstrong "acted in accordance with [their recommendation] without [himself] evaluating [Brown's] situation." *Id.*

Brown attacks Armstrong's independence on several grounds. First, Armstrong considered the recommendation of the DRB in reaching his decision -- a recommendation that Brown says was tainted by retaliation. Brown alleges that DRB member Frank Jones may have known of Brown's EEO activity by virtue of his role Deputy to the Assistant Commissioner for the EEO at the time he served on the DRB. Doc. # 143 at 7-8. But knowledge alone is insufficient to establish improper motive or bias.[4] *See Ferron v. West*, 10 F.Supp.2d 1363, 1366 (S.D.Ga. 1998) ("although the decisionmaker here may have known of [plaintiff's] discrimination claim against the Navy before denying him his desired promotion, that fact alone is legally insufficient (to hold otherwise would in effect

---

[4] Brown alleges bias based on Jones's knowledge of Brown's EEO activity while at the same time alleging that DRB members were biased because they did not possess such knowledge. *See* doc. # 143-2 at ¶ 45 (offering evidence of "the agency's attempt to improperly influence the DRB by not telling the DRB about Brown's prior EEO activity and many other important facts.")

9

impose strict liability, rendering the decisionmaker's explanation superfluous)"). Brown also suggests that two DRB members were not neutral because "Jones and Sauceda had discussions with Reese outside the DRB proceedings about Brown's case." Doc. # 143 at 8. While technically true, Brown's assertion is misleading because it gives the impression of *ex parte* communications that may have influenced the DRB's decision. The record is clear that these conversations took place after the DRB issued its decision, so they could not have influenced its recommendation. Doc. # 84 at ECF pg. 31-34. Thus, Brown has provided no evidence that the members of the DRB had any retaliatory motives or that their independence was compromised.

Next, Brown alleges that the DRB's recommendation and Armstrong's decision were tainted because both relied on biased information put together by Clements and ER representative Coleman. That information contained the memo from Clements that characterized Brown's conduct as "seditious," asserted that Brown was adequately trained to perform his duties when his managers may have known that he was not, and asserted that Brown's caveats on his lab reports rendered them useless when, in fact, his notations were limited to the administrative cover sheet that would not be seen outside the Lab. Doc. # 143 at 29; *see also* doc. # 44 at 7-8 (arguing that lab reports were not rendered useless). Keeping in mind that the information considered by Armstrong did not paint Brown in an entirely negative light,[5] the Court will accept for summary judgment purposes that certain opinions and statements in the Brown's file were tainted by individuals who had a retaliatory animus.

However, the Court cannot agree with the proposition that Armstrong's review of a file containing a biased version of the facts undermined his independence. In any employment dispute, there will be divergent versions of the facts that the decisionmaker will have to weigh. While the Court would be concerned if the decisionmaker gave only one side the opportunity to present its version of the facts, that is not what happened here. When a decisionmaker provides an opportunity for an employee to explain the situation prior to making his decision, the scale tilts against a finding of causation under the cat's paw theory. *See Llampallas*, 163 F.3d at 1249 (a meeting where the decisionmaker gave the employee an "opportunity to explain the situation" sufficed to except that case from the cat's paw line of cases.); *see also Hankins v. AirTran Airways, Inc.*, 237 Fed.Appx. 513, 521 n. 5 (11th Cir. 2007) (Even assuming that manager created a biased report, cat's paw theory did not apply when decisionmaker made an independent investigation which consisted of meeting with someone who had first-hand knowledge of plaintiff's misconduct and a review of plaintiff's overall performance); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) (excepting from cat's paw line a case in which the decisionmaker

---

[5] For example, Armstrong noted that he reviewed Brown's record and that all of his prior performance was "passing" and "fairly good." Doc. # 137-5 at 22. Additionally, while Brown complains that "Mr. Armstrong's review of Mr. Brown's personnel file included Mr. Brown's disciplinary records over four years old, while Mr. Armstrong was only provided Mr. Brown's award and performance records in the three years prior to removal," doc. # 28-3 ¶ 87, information on Brown's awards was in the packet nonetheless. That is not consistent with an allegation that the information provided to Armstrong was entirely one-sided.

investigated a subordinate's motives by meeting with the plaintiff before acting on the subordinate's adverse recommendations) (*cited in Llampallas*, 163 F.3d at 1236); *Barr v. City of Eagle Lake*, 2008 WL 717821, * 9 (M.D.Fla. 2008) (decisionmaker engaged in independent investigation when he met with plaintiff, reviewed a background check on plaintiff, and made his own determination).

Brown was afforded an opportunity to present his version of the facts and the evidence in his favor. The DRB notice sent to Brown explained to him his right to challenge its recommendation. Additionally, Armstrong explained at Brown's hearing that "the purpose of this oral reply is to provide you with an opportunity to respond to the proposed action and state your thoughts and your position.... You are permitted to present your position freely and to furnish any information in affidavits in support of your position." Doc. # 137-4 at 48. Nothing in the record indicates that Brown submitted any affidavits. Brown's representative responded, "I am not going to state today that Mr. Brown's conduct was justified nor will I state that he is blameless." Rather, he challenged the severity of the penalty being handed down. *Id.* at 51. Thus, if any mitigating circumstances did not come to light, it is only because Brown failed to raise them.

The Court does not see evidence sufficient to create a jury issue over whether Armstrong's decision was merely a rubber stamp. *See Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996) (causal link is not severed if the deciding official did not conduct an independent investigation and instead merely "rubber stamped" the recommendations of supervisors). As to the basis of his decision to terminate Brown rather than taking less severe action, Armstrong testified:

> I just didn't feel like that after considering all the factors that in good conscience I could do that. I just felt like he had compromised the mission of the agency and I just didn't feel like I could trust him in a role within the agency after the actions that were taken.... The first charge [for insubordination] to me was so egregious against the agency's mission that it really carried, to me, the weight of my decision. I mean, we have to be able to rely on our employees to carry out the mission and follow the orders that they are given, instructions they are given.

Doc. # 137-5 at 15-16.

Armstrong recognized Brown's many years of satisfactory government service, but emphasized that Brown's actions tainted the laboratory reports and had potentially far-reaching ramifications. Doc. # 137-5 at 15. He considered Brown's claims that he was improperly trained, but did not find them credible. Doc. # 137 at 18. He also thought that the charge of disrespectful conduct stemming from Browns "garden path" email was "very serious." Doc. # 137-5 at 16. When asked why he felt Brown's conduct was egregious, Armstrong stated that Brown's conduct "took lab reports that could potentially be used as evidence in court and discredited them and discredited the work that the laboratory had done and I guess could possibly compromise their accreditation." Doc. # 137-5 at 16-17.

There is no evidence that Armstrong himself possessed any retaliatory animus. Armstrong testified that the first time he learned of the EEO activity was when Brown,

11

through his representative, called it to his attention at the oral hearing, doc. # 137-5 at 11; that "[he] didn't consider any of [Brown's EEO activity] in the work that [he] did to come to conclusions about the case. [He] just dismissed it,"doc. # 137-5 at 12; and that he did not have any communication at all with Clements or any other of Brown's supervisors about the case, doc. # 137-5 at 57, or with the DRB members, doc. # 137-5 at 5-6. Reese did brief Armstrong on Brown's case during Armstrong's transition into the role of Acting Commissioner. Doc. # 143-15 at 19-20. While Reese did not recall expressing an opinion as to what the outcome should be, he did state that the situation was "extremely serious." *Id.* However, there is no evidence that Reese mentioned Brown's EEO complaint or improperly influenced Armstrong.

Brown also asserts that Armstrong's independence was compromised by his interactions with ER specialists Coleman and Canoyer. Doc. # 143 at 8. Canoyer does not appear to have had any contact with Armstrong. Thus, it is quite a stretch to say that she could have directly manipulated Armstrong's decision even assuming she was motivated to do so.[6] As for Coleman, she did have direct contact with the DRB and Armstrong as the ER specialist assigned to Brown's case. However, there is no evidence that she held any retaliatory animus toward Brown or did anything to prevent Armstrong from independently evaluating Brown's case. The most that the Court can glean from the evidence is that she served as an intermediary between management and Armstrong as required by her position as an ER specialist.

Finally, Brown argues that Armstrong's decision would have been different had the Agency conducted a formal Internal Affairs investigation. Doc. # 143 at 26. Brown's theory seems to be that the decision not to conduct a formal IA investigation was made to retaliate against Brown and that such an investigation would have uncovered facts favorable to him.

This Court in a prior Order noted that "there is some discrepancy between the Winwood/Pignone Declaration and Coleman's deposition" and that "this dispute increases the potential importance of any evidence that might explain the decision for IA not to investigate." Doc. # 134 at 6. The "Winwood Memo" written by the Acting Commissioner of Customs in 2001 states that performance related issues such as insubordination and rude or unprofessional conduct need not be reported to IA. Doc. # 119-9. Chris Pignone from the Office of Internal Affairs has declared that "it was not the practice of [IA] to investigate allegations of employee insubordination." Doc. # 137-5 at 74. Frank Cipolla, a Supervisory Employee Relations Specialist, declared that conduct such as blatant insubordination "did not require professional investigators to become involved, since local management could fairly easily document clear-cut misconduct." Doc. # 137-5 at 69.

Arguing that Agency policy required an IA investigation, Brown submits Coleman's deposition which states:

> The normal procedure for cases that go before the discipline review board is that they are reported to [IA]. [¶] And [IA]

---

[6] Brown's evidence of Canoyer's retaliatory bias consists of her involvement of the removal of Brown's name of a list of potential award recipients while the disciplinary charges were pending against him. Doc. # 143 at 9-10.

would opt to investigate or appoint a fact-finder. [¶] In this particular case, all the facts -- there was no need for an investigator or a fact-finder because we had all of the documentation, statements from management.

Doc. # 119-7 at 5. When read in its context, Coleman's explanation is consistent with the Government's evidence that clear-cut misconduct does not require a formal "professional" investigation. The fact that Brown's case was a "rare" one in which the facts were well documented on paper is not evidence that retaliatory motives prevented an IA investigation that should have taken place.

Brown essentially asks the Court to draw the following inferences: (1) that a formal investigation was required even in the face of a large amount of evidence that one was not; (2) that the reason it was not conducted was related to retaliation for Brown's EEO activity; (3) that the investigation would have uncovered facts that were not available to Armstrong; and (4) that these facts would have affected Armstrong's decision to terminate Brown. Given the weight of the evidence that an IA investigation was not required, the fact that Brown's insubordination and disrespectful conduct is clearly documented, the fact that Brown had the opportunity to present any facts that he believes would have been uncovered in an investigation, and the lack of evidence that the investigation did not take place because of improper motives[7], the Court cannot say that a jury could find, by a preponderance of the evidence, that failure to conduct a formal investigation was a retaliatory action that undermined the integrity and independence of Armstrong's decision.

The Court simply cannot say that Brown has presented evidence that Armstrong was a "mere conduit" for retaliatory animus who "rubber stamped" the decisions of Brown's supervisors. Even when inferences are drawn in Brown's favor, the evidence indicates that Armstrong conducted an independent evaluation of Brown's conduct and gave him a full and fair opportunity to present his case. Thus, Brown has failed to prove causation under a cat's paw theory.

While the Court believes that the Government may also have presented a successful mixed motive defense, see doc. # 138 at 16-20, it does not address that issue since Brown has failed to establish causation.

---

[7] The Court in its prior order recognized that "[Coleman's] destroyed notes may have been informative" as to why the agency chose not to conduct an IA investigation. Doc. # 134 at 5. Further, the destruction of the notes caused some prejudice. *Id.* at 7. However, the Court went on to note that "considering the absence of bad faith and the opportunities to alleviate some of that prejudice through testimony, a severe sanction is not warranted here." *Id.* at 8. The remedy the Court chose was a to relieve Brown of his burden of establishing evidence of pretext, if Brown is able to prove a prima facie case. *Id.* The Court did not intend to give Brown a free pass around any evidence necessary to prove its prima facie case. *Id.* at 8 n. 5.

13

## IV. CONCLUSION

In light of the above reasoning, the Court *GRANTS* Michael Chertoff and the Department of Homeland Security's Motion for Summary Judgment on Peter Brown's claim for retaliation in violation of Title VII, doc. # 138, and *DENIES* Brown's Motion to Strike the declarations of Frank Cipolla and Christopher Pignone, doc. ## 144, 153.

This __6__ day of January, 2009.

/s/ B. Avant Edenfield
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA